UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EAZYPOWER CORPORATION, an Illinois Corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>JORE CORPORATION, a Delaware corporation,<br><br>    Defendant. | No. 04 C 6372<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

### I. OVERVIEW

This is a patent infringement action in which Plaintiff Eazypower Corporation ("Eazypower") alleges that Defendant Jore Corporation ("Jore") infringed Claims 1, 2, 4, 5, and 7 ("the Asserted Claims") of U.S. Patent No. 4,876,929 ("the '929 Patent" or "Kozak invention") which issued on October 31, 1989, and is entitled "Portable Screw Driver Having Flexible Extension Shaft." The '929 Patent has expired. Jore comes now with a motion for summary judgment as to the issue of patent invalidity. Oral arguments were heard on August 30, 2010. For the following reasons, Defendant's motion for summary judgment is denied.

### II. PRELIMINARY ISSUES

"Local Rule 56.1(a)(3) requires a movant to submit a statement of undisputed material facts that, according to the movant, entitles that party to judgment as a matter of law." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). According to the rule, the statement "shall consist of short numbered paragraphs," each of which specifically refers to affidavits, parts of the

record, and other material in support of the facts set forth therein. Local Rule 56.1. Defendant has complied with this requirement.

Local Rule 56.1(b)(3)(B) requires the opposing party to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Pursuant to Rule 56.1(b)(3)(C), the non-movant should also file its own statement of additional facts that requires the denial of summary judgment, including references to supporting material. Just as the movant's statement, the non-movant's statement should consist of short numbered paragraphs.

After failing to respond to Jore's statement of material facts, Eazypower sought leave to file a response on February 12, 2010. Eazypower did not notice up its motion, but rather sent an email to Courtroom Deputy Donald Walker. In this email, Eazypower attached its "Motion for Leave to File Eazypower's Response to Defendant Jore Corporation's Statement of Material Facts Regarding its Motion for Partial Summary Judgment of Invalidity" and "Eazypower's Response to Defendant Jore Corporation's Statement of Material Facts Regarding its Motion for Partial Summary Judgment of Invalidity." Counsel for Jore was copied onto that email. I granted Eazypower's motion to file its Response, however Eazypower failed to promptly file its Response on the Court's electronic docket. Nonetheless, on February 26, 2010, in docket entry 120, Jore responded to the documents I granted Eazypower leave to file. On April 1, 2010, I ordered Eazypower to electronically file its Response by April 10, 2010. Eazypower filed its response on Monday April 12, 2010 as docket entry 126.[1]

---

[1] Eazypower correctly notes that April 10, 2010 was a Saturday.

Jore asks that I strike Eazypower's filed Response because the document filed in docket entry 126 differs greatly from the document submitted to the Court on February 12, 2010 which I granted leave to file. Jore is correct. The document in entry 126 includes not only edits to its Objections, but also adds over ten pages in "Additional Facts" not included in its prior submissions to the Court. In its motion to strike Eazypower's response, Jore objected to several additional facts contained in Eazypower's Response which do not comply with Local Rule 56.1. The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance [with Local Rule 56.1]." *Bordelon v. Chi. School Reform Bd. of Trustees*, 233 F.3d 524, 537 (7th Cir. 2000); *Cichon v. Exelon Generation Co, LLC,* 401 F.3d 803, 809 (7th Cir. 2005).

Eazypower failed to initially comply with Local Rule 56.1, yet I granted Eazypower leave to file a tardy Response to Jore's properly filed 56.1 Statement of Facts. Eazypower, however, failed to promptly docket its Response, and instead, two months after I granted leave, filed a new document which included edits and additional facts. While it is within my discretion to strike Easzypower's Response, I decline to do so. Eazypower's statement of additional facts does not include any facts that were not presented in its response to Jore's motion for summary judgment. Jore replied to Eazypower's response and addressed the factual allegations contained therein. Furthermore, Jore has challenged certain "Additional Facts" in its motion to strike. Though Eazypower's compliance with the Local Rules and this Court's Order was severely deficient, because of the complicated facts involved in this case, I will accept Eazypower's Response to Jore's 56.1 statement of facts and Eazypower's statement of additional facts contained therein. Accordingly, Jore's motion to strike Eazypower's response to its statement of facts is denied.

**III. STATEMENT OF RELEVANT FACTS**

   **A. Overview**

   Eazypower is an Illinois corporation engaged in the design, manufacture, packaging, distributing, and selling of hand tools, power tools, and accessories. Jore is a Delaware corporation also engaged in the design, manufacture, packaging, distributing and selling of power tool accessories. Jore and Eazypower are competitors.

   In 2005, Eazypower brought suit against Jore claiming that Jore had infringed, induced infringement, and contributorily infringed on Eazypower's '929 Patent entitled "Portable Screw Driver Having Flexible Extension Shaft." Specifically, Eazypower alleged that a Jore product, the Jore Flex Shaft, infringed on claims 1, 2, 4, 5, and 7 of the '929 patent.

   The '929 Patent was issued on October 31, 1989.[2] It describes a "cordless portable electric screwdriver having a chuck for . . . holding a tool for rotary drive motion at one end" and a "flexible extension shaft." The flexible shaft includes a series of concentric coil springs, which are secured to cylindrical body portions at the ends of the flexible extension shaft. A flexible sleeve surrounds the cylindrical fittings to define internal shoulders. The purpose of the flexible extension shaft is to allow for the use of portable electric screwdrivers in difficult to reach areas of limited access.[3] The '929 Patent was filed on September 15, 1988. Therefore the "critical date," one-year prior to the filing of the patent, is September 15, 1987.[4]

---

[2] The '929 patent is now expired.

[3] Two phrases of the '929 patent were construed in this court's August 14, 2009 Markman Claim Construction Order.

[4] To show invalidity based upon lack of novelty (or anticipation), Jore must prove that (1) every element specified by the asserted claims is found in the FB-19; and (2) that the FB-19 was

In 2009, Jore filed a Motion for Partial Summary Judgment on the basis of patent invalidity, arguing that the '929 Patent is invalid under 35 U.S.C. §102 (a) & (b) because another flexible extension shaft product called the FB-19 (also known as the Shinki FB-19, OMEGA flex shaft, or Tru Value) was in prior use and was previously marketed and sold.[5] The facts of this case are hotly contested.

**B. Comparison between the '929 device and the FB-19**

Jore has put forth the 2002 and 2009 expert reports of Albert Karvelis, Ph.D., P.E. ("Karvelis"). In the reports, Karvelis compared the '929 flexible extension shaft screwdriver with the a FB-19 and determined that the FB-19 contained each and every element of claims 1, 2, 4, 5, and 7 of the '929 patent and therefore anticipates the asserted claims. In his 2002 report, Karvelis explained that the FB-19 used for comparison was provided to him by the attorneys, and he was "asked to assume that this FB-19 is prior art to the '929 patent." Eazypower did not object to the FB-19 Karvelis used in his comparison or rebut the Kravelis report.

**C. Prior Use and Sale in the United States**

Jore has presented testimonial, documentary, and physical evidence to support its assertion that the FB-19 was imported and sold in the United States between 1981 and 1984. Jore maintains that Harrison Fuller, the former president of Omega Precision Hand Tools, Inc.

---

known or used in the United states before the invention of what is defined by the Asserted claims, or was on sale, or in public use in the United States more than one year before the filing date of the '929 Patent. 35 U.S.C. §§ 102(a) and 102(b); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed. Cir. 1983).

[5] Jore has put forth alleged Japanese patent documents. Jore does not, however, rely on these documents in its motion for summary judgment. Accordingly, the dispute regarding the authenticity and significance of these documents is immaterial.

("Omega"), went to Japan and inspected a FB-19 in around 1982. He saw the FB-19 on a visit to the Shinki Industries manufacturing facility in Osaka, Japan. Following this visit, Omega Precision Hand Tools ("Omega"), imported and sold thousands of FB-19s in the United States between 1981 and 1984. It is immaterial whether importation began in 1981 or 1982. The FB-19 flexible extension shafts that Omega sold were packaged by Omega and stamped with Omega trademarks. The FB-19 was packaged individually and sold using an Omega "No. 935x Stubby Ratchet Screwdriver" trademark, and also packaged in a kit together with a stubby ratchet driver and other tools using an Omega "No. 93x Flexible Extender" trademark.

Fuller claims to have found a sample of the FB-19 in his basement. Testing of the tool shows that the packaging dates back to the early 1980's, but residue of an adhesive was found on the packaging despite the fact that no adhesive had been used in the packaging of the original tools in the 1980s.

Eazypower contests that FB-19s were actually imported or on sale in the United States during that time period and presents both testimonial and documentary evidence to rebut Jore's claims. Eazypower challenges the accuracy of Jore's witnesses arguing that they are interested witnesses and that their testimony has been impacted by the passage of time. Furthermore, Eazypower challenges that accuracy and credibility of Jore's documentary and physical evidence.

## IV. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). I consider the record in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). I will accept the non-moving party's version of any disputed fact only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## V. DISCUSSION

Jore moves for summary judgment pursuant to 35 U.S.C. § 102 (a) and (b). To prove invalidity based upon lack of novelty (or anticipation), Jore must prove that (1) every element specified by the asserted claims is found in the FB-19; and (2) that the FB-19 was known or used in the United States before the invention of what is defined by the asserted claims, or was on sale, or in public use in the United States more than one year before the filing date of the '929

7

Patent. 35 U.S.C. §§ 102(a) and 102(b); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed. Cir. 1983). Pursuant to 35 U.S.C. § 282, all issued patents are presumptively valid. Overcoming the presumption requires a showing of facts proved by clear and convincing evidence. *Id*. A "moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly and Co. v. Barr Labs., Inc.* 251 F.3d 955, 962 (Fed. Cir. 2001) (reviewing summary judgment on validity of anti-depressant drug patent). Specifically, Jore argues (1) the FB-19 was known or used in this country before the development of the patented '929 device; and (2) the FB-19 device was on sale and in public use more than one year prior the filing date of the '929 patent.

### A. Identical Asserted Claims

To establish invalidity by anticipation under 35 U.S.C. § 102, Jore must first submit clear and convincing evidence that a previously known, used, or sold invention, allegedly the FB-19, is exactly identical to the '929 patent with regard to the asserted claims, 1, 2, 4, 5, and 7. *See Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1182-83 (7th Cir. 1971) (stating that "unless all of the same elements are found in exactly the same situation and united in the same way to perform an identical function, there is no anticipation"). To meet this burden, Jore presented the 2009 expert report of Dr. Albert Karvelis, which concluded that the FB-19 contains each and every element of Claims 1, 2, 4, 5, and 7 of the '929 patent and therefore anticipates the asserted claims. Eazypower has not responded to the Karvelis report and has offered no evidence to refute its validity. Jore also presented a claim chart, as part of the 2002 Karvelis Report, which includes pictures and an element-by-element comparison. Eazypower

challenges the Karvelis Report stating that it is contradicted by Pleadings filed by a defendant in a previous lawsuit relating the '929 patent. Specifically, Eazypower argues that the "biasing spring claimed in Claim 6 and 8 are not present in the device sold by Harrison Fuller (FB-19)." Jore correctly responds that this biasing spring is the subject of Claim 6 and 8, which are not at issue in this suit. Accordingly, for purposes of this motion, I find that Jore has produced clear and convincing evidence that element-by-element correspondence exists between the Asserted Claims and the FB-19.

**B. Known and In Use Prior to Invention and in Public Use and on Sale in the United States More than One Year Before the Filing Date of the '929 Patent**.

Having established that there is an exact element-by-element correspondence between the Asserted Claims and the FB-19, I must now determine whether there is an issue of material fact as to whether FB-19 was known, used, sold, or patented before the dates of invention or application under 35 U.S.C. §102(a) & (b). The facts relevant to such a determination are hotly contested.

1. Testimonial Evidence

Because much of the evidence put forth by Jore to establish prior knowledge, use, sale or patent comes in the form of deposition testimony or signed declarations, it is important to note the weight of such evidence in patent validity cases, another issue upon which the parties disagree. Eazypower contends that oral testimony is insufficient to invalidate a patent by clear and convincing evidence. This is an overly simplistic statement of the law.

The Federal Circuit has held that "uncorroborated oral testimony, particularly that of interested persons recalling long-past events, does not, of itself, provide the clear and convincing

evidence required to invalidate a patent." *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1369 (Fed. Cir. 1998). When the testimony of one witness alone is asserted to invalidate a patent, corroboration is required." *Finnigan Corp. v. Int'l Trade Comm.*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999). *See also Juicy Whip, Inc. v. Orange Bang, Inc.,* 292 F.3d 728, 740-43 (Fed. Cir. 2002) (holding that oral testimony by six interested witnesses uncorroborated by documentary evidence was not sufficient evidence to support a jury's finding of anticipation). The Federal Circuit has held that "corroboration may be in the form of either documentary or testimonial evidence, but is unnecessary when a party seeks to prove facts through the use of contemporaneous documents." *Lacks Industries v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003). The question of whether sufficient corroboration exists should be determined based on the totality of the circumstances. *See, In re Reuter*, 670 F.2d 1015, 1021 n.9 (C.C.P.A. 1981).

Jore presented statements from four different witnesses including: (1) Harrison Fuller ("Fuller"), former President of Omega Tools; (2) Bernard Zurn ("Zurn"), department manager of Cotter & Company, who purchased tools from Omega from 1977 through mid-1980s; (3) Alan Hoffman ("Hoffman"), friend of Fuller, who received a FB-19 from Fuller in 1984 or 1985 and used it "continuously," and (4) Stanley Ryman ("Ryman") of Royal Tools who acquired the Omega assets from Fuller and recalls a combination set flex shaft in the inventory when he did the valuation of all the tools at the time of the acquisition.

Fuller testified that Omega sold many FB-19s to Cotter & Company, the national cooperative buying organization for True Value Hardware stores. Zurn was the buyer. The FB-19 flexible shafts sold to True Value during this period were packaged by Omega in a True Value package using their SERVESS trademark for resale in the United States through True Value

10

hardware stores.  Fuller estimates that Omega purchased and then resold 50,000 - 100,000 FB-19 flexible shaft extensions from 1981-1984.  Fuller also produced a FB-19 in its blister packaging that he claims has been in his basement continuously since 1984.

Zurn served as department manager of power and hand tools at Cotter & Company during the period of 1972 to 1987.  Cotter & Company was a cooperative in the business of supplying merchandise to True Value Hardware stores.  Zurn testified that Cotter & Company purchased small hand tools from Omega.  Cotter & Company introduced the "SERVESS" brand name during 1981-1983 for small imported hand tools to be sold in the United States at True Value Hardware stores.  No additions were made to the SERVESS product line after 1985.  Zurn identified a SERVESS brand blister package containing an FB-19 stamped with the Omega trademark as a product Cotter & Company purchased from Omega in the early 1980s.  He knew that the product was sold in this time frame because "it has the Servess packaging."

Fuller was personal friends with Hoffman.  Fuller gave Hoffman an Omega flexible shaft in 1984 or 1985.  Hoffman used this tool many times.  Upon learning of this patent infringement action, Hoffman informed Fuller that he had an Omega flexible extension and subsequently gave this to Fuller.

Ryman started a company in 1958 that became Royal Tools and later Royal United Corp. The company business was the sale of do-it-yourself hand tools.  Ryman was familiar with Omega because it was a competitor or Royal Tools, and also knew that Omega sold products to Cotter & Company under the Servess brand.  Ryman purchased Omega assets including a quantity of tools of the OMEGA product line, display boards, catalogs, catalog sheets, and support material, when Omega was sold.  Ryman did not recall whether the acquired tools included a single flexible extension shaft, but did remember that there was a combination set that included a flexible

extension shaft.

Eazypower challenges the testimony of Fuller, Ryman, Zurn and Hoffman arguing that they are unreliable interested witnesses and that their recollections are too remote in time to the alleged event of anticipation. While Eazypower admits that no witnesses are a party to this lawsuit, it nonetheless argues that at least three parties have an interest in having the patent declared invalid. I do not find that these parties are interested witnesses.

Regarding Fuller, Eazypower argues that his testimony is tainted (1) because he accepted a check for charity prior to being deposed; (2) he had a relationship with the attorneys for Vermont American, the defendant in a previous Eazypower litigation; and (3) Fuller and Eazypower were competitors in the tool industry. I do not find that any of these statements show that Fuller is an interested witness for purposes of this litigation. Regarding Ryman, Eazypower states that he was a competitor of Eazypower and additionally had an adverse history with Kozak in relation to the '929 patent. The testimony presented fails to establish that Ryman is an interested witness. As to Zurn, Eazypower contends he was a "close business associate" of Fuller. This assertion is not supported by the record. Similarly, Eazypower's other arguments that Zurn is an interested witness because he had an unfavorable relationship with Kozak, or that he had a favorable business relationship with Vermont America fail. Eazypower further suggests that Hoffman's testimony should be considered unreliable because of his personal relationship with Fuller, namely, that they are personal friends and belong to the same country club. I am not persuaded by the testimony presented by Easypower that any of Jore's witnesses have conflicts sufficient to be considered interested.

To establish remoteness, Eazypower simply pointed to the long period of time that has passed since the time of the alleged anticipation and the present depositions, more than 15 years.

*See Woodland Trust,* 148 F.3d at 1373 (cautioning against reliance on "the frailty of memory of things long past and the temptation to remember facts favorable to the cause of one's relative or friend"). While the remoteness in time raise certain issues as to the accuracy of testimony, each witness has provided an independent recollection of the FB-19. Furthermore, the remoteness of witness testimony applies with equal force to witnesses of either party. I do not find that either remoteness or interestedness significantly detracts the testimony by Jore's witnesses or creates a question of material fact as to their testimony.

Eazypower presented testimony from Terrence Schlott ("Schlott"), Steven Genske ("Genske"), and Robert Zerwer ("Zerwer") to challenge the assertion that the FB-19 was actually sold by Omega in the United States.

Schlott, Sales Manager and later President of Clark-Hall, Inc., was familiar with Omega products because Clark-Hall offered the Omega line for resale, offered Omega products for retail and warehoused Omega products. From 1971 through 1985 he held the positions of Salesman, Sales Manager and Vice President, and from 1985 through 1996 he was the President of the company. His responsibilities at Clark-Hall included buying power tool accessories. Schlott states that Eazypower's flexible extension, the Flex-a-Bit, was the first flexible extension with an outer sheath that did not rotate. Further, Schlott states that he was familiar with the Omega line of tools in the 1970s and 1980s and at no time did Omega offer a flexible extension with an outer sheath that did not rotate.

Genske was employed by Cotter & Company from 1983 to 1994, and from 1987 through 1994 was the Department Manager/Buyer for Power Tools and Accessories/Farm and Heavy Hardware. Genske was familiar with the SERVESS product line and Eazypower products, including the flexible shaft extension. To his knowledge, the Eazypower flexible shaft extension

13

tool was the first flexible extension with an outer sheath that did not rotate sold by Cotter & Company.

From 1974 to 1984 Zerwer was a rebuyer for Cotter & Company. Zerwer also stated that prior to 1989, and particularly during the years 1981 to 1984, he cannot remember ordering or re-ordering a flexible extension shaft-type tool from Omega Tools. The "Flexi-a-Bit" manufactured by Eazypower was the first flexible extension tool he purchased or re-bought for True Value. All of these records started in 1989.

Next, Eazypower contends that there is a complete lack of documentary evidence to show that the FB-19 was manufactured, let alone sold, before the critical date. While Fuller's testimony states that 50,000 to 100,000 of the FB-19 devices were purchased by Omega and resold in the United States, he admits that he does not have any documentation to support his statements regarding the sale of FB-19s. These records, Fuller stated, were transferred to Royal Tool, however Ryman does not have any such record. Ryman stated that Royal received no such documents as part of its purchase of the Omega assets. Additionally, according to Port Import Export Reporting Service ("PIERS") Data Analysis conducted for 1983 and 1985, there was no Shinki entity that exported anything in 1983. Likewise, PIERS found no documentation to show that Shinki exported anything to an importer named Omega Tools in 1983 or 1985. The PIERs report indicated that when items are shipped, there is a Bill of Lading that details "what is being shipped where." These documents are filled out by the shippers. Unless the Bill of Lading is "written to show a specific brand name in the commodity, it won't show up that way in the PIERS report."

I find that Eazypower has raised a question of material fact regarding the importation and sale of the FB-19s. There is an essential conflict between the testimony put forth by each party,

14

and therefore, a clear question of material fact to be decided by a jury.

      2. Corroborative Physical Evidence

            a. Sales Literature

Jore submitted an Omega catalog sheet, price list and product promotional sheet to show sales activity related to the FB-19. Eazypower contends that the Flexible Extender in the Omega Literature is not the same device as either the Kozak invention or the FB-19 device arguing that the devices in the Omega literature cannot contain each and every element of either the Kozak invention or the FB-19 because the device in the literature is a 6-inch flexible extender that bends to 45 degrees, whereas the Kozak Invention, and the FB-19, are 71/2 inches long. I need not determine whether the drawings depict each element of the Kozak Invention, because the expert report has already determined that the FB-19 contains each and every element as to the Asserted Claims.

Fuller testified that the FB-19 was sold as Omega Nos. 935x and 93x. The descriptions in the literature describe these items as being 6 inches long. The Omega FB-19 flexible extension found in Fuller's basement was 71/2 inches. Fuller explains this discrepancy in a second declaration stating that during 1981-1984, when Omega was selling the FB-19 flexible extension shaft, it was customary to describe the length of extensions "in a round number that corresponded to the amount of useful extension that would be available through its use." Further, Fuller stated that "the male hexagon shaped end portion of the shaft would not be included in the described length of the shaft, because this end portion would be received in the chuck of a driving tool and therefore would not provide any useful extension to a user." As a result of these practices, the FB-19 shaft sold as the Omega 93x was described as a "6 inch extension."

Ryman provided conflicting testimony as to the customary practice of measuring. Ryman

15

testified that in terms of overall length, a tool is measured from tip to tip. However, Ryman also stated that tools such as screwdrivers are measured by the length of the blade, and not the length of the tool. Eazypower contends that the physical evidence shows that "customary practice" in the industry is to measure and advertise the full length of the flexible extender noting that both Jore and Eazypower describe their flexible extenders using the tip to tip method. The industry practice in 1981-1984 however is not material to this motion. What is material is whether the FB-19, measuring 71/2 inches tip to tip, is the same product advertised as the Omega 93x. Again, the presented testimony is in conflict and a question of fact exists.

### b. FB-19 Found in Fuller's Basement

Fuller produced an FB-19 in its blister packaging that he claimed had been in his basement since 1984. The FB-19 and packaging that had allegedly been in Mr. Fuller's basement since 1984 were age tested. A laboratory report dated April 1, 2002 provides the results of age testing on the OMEGA SERVESS package. The lab results indicate that the SERVESS branded, adhesive sealed package was likely produced 15-20 years prior to 2002 (approximately 1982-1987). The analysis included data obtained from Fourier Transform Infrared testing of the transparent plastic blister material and the adhesive bonding the blister to a chipboard backing, and data obtained by visible spectroscopy on white regions of the chipboard backing and the plastic blister material. The report stated that the "yellowing of the chipboard base of the blister package, [] the vinyl blister, condition of the contact adhesive, presence of the round, punched hang hole [] and PVC material used in the style of package does indicate, in our opinion, the package to have been produced in the late 1970's to mid 1980's."

Eazypower challenges the laboratory analysis conducted on the packaging of the OMEGA SERVESS package found in Fuller's basement. The lab results indicate that the SERVESS

16

branded, adhesive sealed package was likely produced 15-20 years prior to 2002 (approximately 1982-1987). The report concluded that there was an adhesive holding the lower part of the plastic "blister" to the card. However, in Fuller's deposition testimony, he admitted that no glue or adhesive was ever used in the packaging of the FB-19. Instead, the blister pack was secured to the card by heat and pressure. Fuller admitted that to re-seal the package adhesive could be used, and Fuller stated that he had never removed the extender from the package. Eazypower contends that it is a reasonable inference that the package was opened, a different tool inserted, and resealed. While I do find that a "reasonable inference" indicates tampering, as Eazypower suggests, the adhesive results do raise a question of fact as to the true age of the tool found within the packaging found in Fuller's basement.

Eazypower further questions the authenticity of the FB-19 sample because it lacks "Made in Japan" markings. Pursuant to Federal Statute, all exports to the United States are required by law to be marked in a manner that would avoid customer confusion. 19 U.S.C. § 1304(a) Specifically, Federal Statute 19 U.S. C. § 1304(a) requires that "every article of foreign origin [] imported into the United States [] be marked in a conspicuous place [] the name of the country of origin of the article." This requirement was in effect during the period that Omega claims to have been importing the FB-19s from Japan. Furthermore, until 1997, 19 C.F.R. § 134.46 required that:

> In any case in which the words "United States," or "American," the letters "U.S.A.," any variation of such words or letters, or the name of any city or locality in the United States, or the name of any foreign country or locality other than the country or locality in which the article was manufactured or produced, appear on an imported article or its container, there shall appear, legibly and permanently, in close proximity to such words, letters or name, and in at least a comparable size, the name of the country of origin preceded by "Made in," "Product of," or other words of similar meaning.

Kozak noted in his declaration that the printed words on the FB-19 sample package state "Manufactured for True Value Hardware Stores/Headquarters Chicago, IL 60614," yet there is no country of origin disclosure printed in proximity as required by the statute. This, Eazypower contends, is evidence that the FB-19 tools were never sold in the United States. Fuller, however, noted that the *tool* he examined in his deposition was marked "Japan, Omega, Japan, Patent P, patent pending." Regardless of whether or not the markings are in compliance with the federal statute, the testimony of Kozak does not refute Fuller's testimony because Kozak referenced the packaging, and Fuller testified as to markings on the tool. However, the lack of statutory compliance does raise a question of fact regarding the importation of the FB-19s from Japan into the United States.

3. Summary of Findings

The standard for finding summary judgment as to the issue of validity is clear and convincing evidence. All facts must be construed in favor of the non-movant. Here, there are numerous factual disputes. Jore contends that the FB-19 was sold by Omega in the United States since 1981 and has presented testimonial and physical evidence such as a time tested specimen to show that Fuller and Omega imported FB-19 devices from Japan from 1981-1984. Jore has also presented written literature to show that the FB-19 was sold in the United States during that period.

To meet its burden, Eazypower must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. I find that Eazypower has met this burden. Eazypower has presented testimonial evidence to rebut Jore's contention that the FB-19 was sold in the United States prior to the issuance of the '929 Patent. Further, no import or export documentation has been provided, and Eazypower has presented a PIERS report to show that in

1983 and 1985 there were no records for Shinki exporting goods to Omega Tools as the importer. While these reports were not conducted for the entire duration of the alleged import/export period, the lack of documentation regarding importation of the FB-19 does raise a question of material fact as to the dates of the FB-19s importation and sale in the United States. Furthermore, the appearance of adhesive glue on the packaging of the FB-19 tool provided by Fuller raises a question of fact as to the age of the tool found inside the package, and the lack of any country of origin markings on the package raise a question as to its importation into the United States from Japan.

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment as to the issue of invalidity is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: October 20, 2010